[Civ. No. 17363.   Second Dist., Div. Three:   Feb. 17, 1950.]

FRANK S. BUNKER, Petitioner, v. SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.

Henry E. Kappler and Walter N. Anderson for Petitioner.

W. E. Simpson, District Attorney, and Robert Wheeler, Deputy District Attorney, for Respondent.

SHINN, P. J.—Petitioner seeks by writ of prohibition to prevent his prosecution under an indictment charging him and three others with the offenses of abortion and murder. The decedent will be referred to as Miss B.   The trial court denied defendants' motion under 995, Penal Code to quash the indictment for lack of any evidence to support it.   The same ground of attack is urged in the present proceeding.   We are convinced that it has merit.

The transcript of the testimony given before the grand jury contains evidence of the following facts: Miss B was an unmarried 17-year-old high school student.   For some time prior to May, 1949, her health had not been normal.   On that day, she was examined by a gynecologist and found to be four and a half or five months pregnant.   On May 20th, her parents took her to the offices of Dr. William Eisoff, who arranged by telephone for an abortion to be performed.   He stated that he would call them later in the day to give them

the time and place for the operation. About 6 o'clock in the evening, the parents received a phone call from someone they believed to be Dr. Eisoff, telling them to take their daughter to 4230 South Figueroa Street in Los Angeles at 7:30 the following morning, that the price would be $500, and that they were to ask for Mary and say they were Dr. Arons' patients. On the morning of May 21, 1949, the three went to the appointed address, which was the medical offices of petitioner Dr. Frank S. Bunker. They were there met by Dr. Leonard Arons and Mary Jensen, a nurse employed by Dr. Bunker. Dr. Arons examined the girl and instructed Mary Jensen to feel her stomach. He said, "Oh, nothing to it. That's just liquid." Then, taking the parents into another room, in private conversation, Dr. Arons said they would "pack" the patient, and that there was nothing to it. The father paid Arons $500 in cash. The parents then went home, after Dr. Arons promised to call them about 11 a.m., leaving their daughter in the care of Dr. Arons. At 9:45 a.m. Dr. Theodore Bluechel, an experienced surgeon, received a phone call from Mary Jensen, who told him that Dr. Arons, who was working in Dr. Bunker's office, had a surgical case of acute appendicitis, and wanted Dr. Bluechel to operate at once, at the South Hoover Hospital. At 10 a.m. the parents received a phone call from Mary, informing them that "the doctor decided we needed surgery," and that their daughter was going to be transferred to the South Hoover Hospital "as an acute appendectomy." The parents returned to Dr. Bunker's office, where they signed a consent to surgery and a statement releasing Dr. Bunker from liability. Miss B was removed to the hospital in an ambulance. She was delirious and moaning at the time. Dr. Bluechel arrived at the hospital at 11 a.m. He met Dr. Arons, who told him the patient had acute appendicitis, possibly a ruptured appendix, and that he, Dr. Arons, had just examined her at Dr. Bunker's office that morning. Dr. Bluechel operated at once, in the presence of Dr. Arons. It was discovered that an abortion had been attempted and that severe internal injuries had been incurred by the patient. Dr. Bluechel asked Dr. Arons if he knew anything about it, and "he said that an abortion had been attempted." Dr. Bluechel repaired the damage so far as possible, but, as a result of peritonitis due to her injuries, Miss B died on May 27th. There was medical testimony that an abortion was not necessary to save her life.

The only evidence relating in any degree to Dr.

Bunker consists of the following: He owned the offices at 4230 South Figueroa; he had known Dr. Arons for about a year and had an arrangement with him for the latter to come to Dr. Bunker's office over weekends to take care of the patients of both doctors; on the morning of May 21st Dr Bunker was studying for an examination upstairs from the office; he stated to the arresting officer that "about 9:15 A.M. he received a call that there was a mutilation case in the office and that he had gone down there to see what it was all about; when he got to the office he looked in and saw this girl and said she should be taken to the hospital immediately"; on June 2d, when Dr. Bunker was arrested, certain surgical instruments which would be useful in the performance of an abortion were found in his office; in addition some nine drawers were found to be missing from a filing cabinet which ordinarily would have held 12 or 14 drawers; Dr. Bunker stated to the officer that he did not know what had become of the missing drawers but that "maybe the bookkeeper took them to get out the statements." Miss B's mother testified that at the request of the nurse, Mary Jensen, she had signed an instrument releasing Dr. Bunker from liability when it was found necessary to transfer her daughter to the hospital. It appears also from the testimony of the arresting officer that when asked certain questions at the time of his arrest Dr. Bunker said he would rather not answer without the advice of an attorney.

The foregoing is the only evidence before the grand jury which tended in any degree to connect petitioner with the offenses. There was other evidence, which was uncontradicted, that Dr. Bunker was not present when Miss B and her parents arrived at the office; that at no time did the parents see or have any dealings whatsoever with Dr. Bunker; that he was not present during Dr. Bluechel's operation, and never visited Miss B or gave her any medical care while she was in the hospital. Moreover, according to the father's testimony, he, and it may be inferred his wife also, did not even know that the offices at 4230 South Figueroa were Dr. Bunker's until after the operation had taken place.

The transcript discloses no evidence whatsoever which connects Dr. Bunker with the commission of the offenses for which he was indicted. Mere ownership of the building wherein the abortion allegedly took place, and consent to the use of office facilities by Dr. Arons are not indicative of guilty knowledge in view of the complete absence of any evidence that

Dr. Bunker participated in, or had any knowledge of the contemplated abortion. (See *Dong Haw* v. *Superior Court*, 81 Cal.App.2d 153, 158 [183 P.2d 724].) Considering the nature of the arrangement between Dr. Arons and Dr. Bunker for the former to have the use of the latter's well-equipped office on weekends, we think no special significance, so far as Dr. Bunker is concerned, may be attached to the early hour of the appointment, nor to the fact that Dr. Bunker's nurse remained on duty while Dr. Arons was using the office. There is not a shred of evidence tending to show that the surgical instruments found in Dr. Bunker's office some 11 days later were used in the commission of the abortion or were intended to be so used. It is manifest that mere possession of instruments useful for that purpose conveys no permissible inference of guilt. It appears from Dr. Bluechel's testimony that the instruments were such as are customarily employed in the practice of gynecology. Moreover, a miscarriage may be legally procured in certain cases. (Pen. Code, § 274; *People* v. *Murphy*, 60 Cal.App.2d 762, 771 [141 P.2d 755].) Neither the execution of the release of Dr. Bunker from liability at the request of the nurse, nor the absence of the filing drawers, does more than create the vaguest sort of suspicion; and they have no legitimate tendency to implicate Dr. Bunker in the offense charged. The former, so far as evidence shows, was evidently a mere routine step taken by Dr. Bunker's nurse in view of his order that the patient be sent to the hospital at once; and there is nothing to render improbable Dr. Bunker's explanation of the missing records. Likewise, no inculpating inference may be derived from Dr. Bunker's refusal to answer, without the advice of any attorney, certain questions asked by the arresting officer. These queries related chiefly to statements and conduct of Dr. Arons, and none of them was in any way accusatory of Dr. Bunker, so as to call for a denial. These circumstances, like all of the others in evidence relating to Dr. Bunker, are fully consistent with innocence, and do not, by any logical process, provide a basis for an inference of guilt. The record is devoid of even a scintilla of evidence that Dr. Bunker knew of Miss B's pregnancy, or that she was in his office, until after the attempted abortion took place. There is no testimony whatsoever tending to show that Dr. Bunker was aware of what Dr. Arons was doing in his offices, on the occasion in question or at any other time, or that Dr. Bunker shared in the fee paid to Arons. The record as a whole, fairly depicts a rather un-

usual situation wherein, if the truth of the testimony be assumed, a physician who has been permitted to use a brother physician's facilities for legitimate purposes, has used them illegally. Any other inference on the basis of the present record would be entirely unreasonable.

Section 921 of the Penal Code provides that ''[t]he grand jury ought to find an indictment when all the evidence before them, taken together, if unexplained or uncontradicted, would, in their judgment, warrant a conviction by a trial jury.'' In considering the effect of this section, it has been held that a valid indictment cannot be founded upon mere speculation and conjecture, but must have a basis in evidence providing a rational ground for an assumption of the possible guilt of the accused. Where the evidence before the grand jury furnishes no reasonable basis for an indictment the court is without jurisdiction to proceed to trial and will be restrained by writ of prohibition. (*Greenberg* v. *Superior Court,* 19 Cal.2d 319 [121 P.2d 713].)

Let the peremptory writ issue.

Vallée, J., concurred.

Wood, J., dissented.

A petition for a rehearing was denied March 6, 1950. Wood, J., voted for a rehearing. Respondent's petition for a hearing by the Supreme Court was denied April 17, 1950. Shenk, J., Edmonds, J., and Spence, J., voted for a hearing.